# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JUDICIAL WATCH, INC.,

        Plaintiff,

        v.                   Civil Action No. 10-00302 (BAH)

U.S. DEPARTMENT OF THE TREASURY,

        Defendant.

## MEMORANDUM OPINION

Plaintiff Judicial Watch, Inc. brought this case to compel the U.S. Department of the Treasury to respond to a Freedom of Information Act ("FOIA") request. The plaintiff's FOIA request sought documents related to the Treasury's Troubled Asset Relief Program ("TARP"). Specifically, the requests relate to three meetings involving Kenneth Feinberg, an official who served as Special Master for Executive Compensation under TARP. The FOIA generally requires the disclosure, upon request, of records held by a federal government agency unless the records are protected from disclosure under one of nine FOIA exemptions. In this case, the Treasury Department has produced 44 pages of responsive documents to the plaintiff and has also withheld, in whole or in part, other documents that the Treasury claims fall under one or more of the FOIA exemptions. The plaintiff claims that the Treasury improperly withheld or redacted seven of these documents because, according to the plaintiff, these seven documents are not subject to any FOIA exemptions. The Treasury has moved for summary judgment seeking a determination that it has fulfilled its obligations to respond to the plaintiff's FOIA request and that the seven documents in question properly fall under FOIA exemptions. The plaintiff filed a cross-motion for summary judgment seeking a determination that the asserted exemptions are not

applicable and that the documents should be released. For the reasons explained below, the Court grants summary judgment to the Treasury for all disputed documents and denies summary judgment to the plaintiff, except that the Court finds that one document contains some reasonably segregable material that should have been released.

## I.      BACKGROUND

On November 23, 2009, Plaintiff Judicial Watch, Inc. submitted a FOIA request to Defendant U.S. Department of the Treasury seeking documents related to TARP, a federal program designed to assist troubled banks. Compl. ¶ 5. The plaintiff is a private foundation that regularly serves requests on government entities under the Freedom of Information Act, 5 U.S.C. § 552, and shares its findings with the public. Compl. ¶ 3.

Congress created TARP as part of the Emergency Economic Stabilization Act ("EESA"), which was enacted on October 3, 2008 during a time of great financial turmoil. Emergency Economic Stabilization Act of 2008, Pub. L. No. 110-343, 122 Stat. 3765 (2008). The EESA established the Office of Financial Stability ("OFS") within the Treasury, and authorized OFS to implement TARP. *See* 122 Stat. at 3767. Congress's intention in creating TARP included stabilizing the financial markets quickly and effectively, bolstering the housing market by avoiding preventable foreclosures and supporting mortgage finance, and protecting taxpayers. *See* 122 Stat. at 3765-66, 3770.

Section 111 of EESA prescribes certain standards for compensation and corporate governance for recipients of financial assistance under TARP. Def.'s Mem. in Supp. of Mot. for Summ. J. ("Def.'s Mem.") at 3. To assist with the implementation of Section 111, the Treasury appointed Kenneth R. Feinberg as Special Master for TARP Executive Compensation (the "Special Master") and established the Office of the Special Master for TARP Executive

Compensation (the "Office"). *Id.* at 3-4. One of the Special Master's primary responsibilities is reviewing and approving compensation payments and structures of executives of entities designated as "Exceptional Assistance Recipients," including, as relevant here, the large insurance company known as the American International Group or AIG. *Id.*

Additionally, the Treasury published an Interim Final Rule under Section 111 of EESA (the "Interim Final Rule"), which provided guidance on the compensation and corporate governance provisions. *Id.* Under the Interim Final Rule, Exceptional Assistance Recipients, such as AIG, must obtain approval from the Special Master for the compensation structures and payments to their "Top 25 executives" and for the compensation structures of "Covered Employees 26-100." *Id.* The Special Master is tasked with determining whether these compensation structures are inconsistent with Section 111 of EESA or TARP, or otherwise contrary to the public interest. *Id.* The Special Master's determinations are presented in memoranda, which describe the analysis and rationale behind the Special Master's conclusions. *Id.*

In preparing these written determinations, the Office officially requests data from each Exceptional Assistance Recipient regarding the historical and proposed compensation structures. Based on this information, the Special Master is required to issue his initial determination regarding approval of the compensation structure. *Id.* at 4-5. Exceptional Assistance Recipients may then request reconsideration of the initial determination. *Id.* at 5. Subsequently, the Special Master must provide a final determination. *Id.*

Throughout this process, the staff of the Office maintain regular communication with Exceptional Assistance Recipients regarding both procedural matters and substantive concerns about proposed compensation structures. *Id.* Additionally, Office staff review the data

submissions from the Exceptional Assistance Recipients and produce an issues list for the

Special Master's consideration.  *Id.*  The Special Master and members of his staff also regularly

interact with Exceptional Assistance Recipients, including formal, in-person meetings with a

recipient's senior executives, to discuss proposed compensation structures.  *Id.* at *6.*

On November 23, 2009, the plaintiff submitted a FOIA request to the Treasury seeking

records related to these formal, in-person meetings involving the Special Master and Exceptional

Assistance Recipients, in particular, AIG.  *Id.*; Compl. ¶ 5.  Specifically, the plaintiff's request,

in its entirety, sought the following documents:

> 1. Any and all records, including agendas, briefing papers, memoranda, minutes,
>    notes, presentations, and/or summaries of the  meeting on November 4, 2009
>    between Kenneth Feinberg, the special master for TARP executive compensation
>    of the U.S. Treasury, Robert Benmosche, the CEO of the American International
>    Group, and AIG's Board of Directors.
>
> 2. Any and all records, including agendas, briefing papers, memoranda, minutes,
>    notes, presentations, and/or summaries of the meeting on November 12, 2009
>    between Kenneth Feinberg, the special master for TARP executive compensation
>    of the U.S. Treasury, and William Dudley, president of the New York Federal
>    Reserve Bank.
>
> 3. Any and all records, including agendas, briefing papers, memoranda, minutes,
>    notes, presentations, and/or summaries of the meeting on November 17, 2009
>    between Kenneth Feinberg, the special master for TARP executive compensation
>    of the U.S. Treasury, and Robert Benmosche, the CEO of the American
>    International Group.

Compl. ¶ 5.

The plaintiff brought this case on February 25, 2010 to compel the defendant's response

to its FOIA request.  *See* Compl.  The defendant subsequently produced 44 pages of responsive

documents, with certain information redacted based on various statutory exemptions to FOIA's

disclosure requirements.  Def.'s Mem. at 9.  The defendant also withheld in full an additional 19

pages based on various statutory exemptions to FOIA's disclosure requirements.  *Id.*

The plaintiff challenges the defendant's withholding or redaction of seven of these documents ("disputed documents") based on two of the nine statutory FOIA exemptions: Exemption 4, which protects privileged and confidential trade secrets and commercial or financial information; and Exemption 5, which protects documents that would not ordinarily be available through discovery to a litigant in a civil suit with the agency. *See* Pl.'s Mem. in Opp'n to Def.'s Mot. for Summ. J. and in Supp. of Pl.'s Cross Mot. for Summ. J. ("Pl.'s Mem.") at 3; *see also* 5 U.S.C. §§ 552(b)(4) and (b)(5). The disputed documents all concern the November 3, 2009 meeting between the Special Master and the AIG Board of Directors, during which AIG provided a summary of its employee retention programs and an overview of its business recovery and stability, as well as raised issues related to compensation structures.[1] Def.'s Mem. at 4-6. The plaintiff is interested in disclosure of the disputed documents because, according to the plaintiff, it is "time to shed light on AIG, a corporation owned largely by the federal government, and thus, owned largely by the public." Pl.'s Mem. at 21.

The seven disputed documents are described below:[2]

a. **Four e-mail strings, redacted in part:** The emails strings, dated November 2, 2009, are between Treasury Staff and Treasury Legal regarding Special Master Feinberg's anticipated meeting with AIG scheduled for November 3, 2009 (Bates numbers 35-36, 37, 38, and 39-40);

b. **Three attachments, withheld in full:**

1. "Current Draft Talking Points," dated November 2, 2009 (Bates numbers W1-9);

---

[1] The November 4, 2009 meeting mentioned in Plaintiff's FOIA request actually took place on November 3, 2009. Def.'s Mem. at 3 n.1. The records that relate to the November 12 and 17, 2009 meetings are no longer in dispute. *Id.* at 6 n.2.

[2] The Court will refer to the documents by their Bates stamp numbers, omitting any initial zeroes. Some documents contain several pages. For ease of reference, the Court will refer to each multi-page document as a single document.

2.  Two "draft issues list" memoranda, dated November 2, 2009 (Bates numbers

W10-12, W13-15).[3]

*Vaughn* Index, Exhibit A to the Declaration of Joseph J. Samarias, dated September 28, 2010.

The defendant asserts that these disputed documents or the redacted portions of them fall

under the following FOIA exemptions:

1.  **Exemption 4** (privileged and confidential commercial information): All disputed

documents.[4]

2.  **Exemption 5** (documents that would not be available in civil discovery): All

disputed documents except "Current Draft Talking Points."

Def.'s Mem. at 14, 23-24;

On September 28, 2010, the defendant moved for summary judgment on the disputed

documents pursuant to Rule 56 of the Federal Rules of Civil Procedure. Along with its summary

judgment filing, the defendant has provided a *Vaughn* index and four declarations that describe

the basis for its assertion that each of the disputed documents is covered by an exemption. *See*

Declaration of Joseph J. Samarias, dated September 28, 2010 ("Samarias Decl."); Samarias

Decl., Exhibit A ("*Vaughn* Index"); Declaration of Eric Litzky, dated September 28, 2010

("Litzky Decl."); Declaration of Jeffrey Hurd, dated September 28, 2010 ("Hurd Decl.");

---

[3] Although the *Vaughn* Index refers to these two documents as "draft issue list" memoranda, the Court's *in camera* inspection reveals that the title of the document is actually "Issues List." Therefore, the Court will refer to these two documents as "draft issues list" memoranda. Additionally, the Court's *in camera* review indicates that the two "draft issues list" memoranda are identical except for the revision indicated in the e-mail string (Bates number 37) accompanying the revised draft issue list memorandum (Bates numbers W13-15).

[4] Although the redacted information in the e-mail string labeled with Bates number 37 is not marked with Exemption 4 in the version produced for *in camera* inspection, the *Vaughn* Index, the Declaration of Joseph J. Samarias, and the defendant's motion papers all state that information in this e-mail string is also properly redacted under Exemption 4. *Vaughn* Index; Samarias Decl. ¶ 16; Def.'s Mem. at 23-24. The Court assumes that the discrepancy is attributable to an error in marking the redaction on the e-mail string and not in the rest of the defendant's submitted materials. Following the Court's *in camera review*, the information in the e-mail string appears to be financial information that would fall under Exemption 4. Even if the information were redacted only under Exemption 5, the information would still be properly withheld, as the Court explains below, due to the deliberative process privilege.

Supplemental Declaration of Joseph J. Samarias, dated November 22, 2010 ("Suppl. Samarias Decl.").

On October 29, 2010, the plaintiff filed a cross-motion for summary judgment alleging that the defendant has failed to meet its burden in demonstrating the applicability of both FOIA Exemptions 4 and 5. Pl.'s Mem. at 3, 21. The plaintiff does not challenge the adequacy of the defendant's search for documents responsive to its request. *Id.* at 3. The sole issue before the Court is whether the defendant properly withheld the disputed documents under FOIA Exemptions 4 and 5.

On July 19, 2011, the Court directed the defendant to provide unredacted versions of the disputed documents for *in camera* inspection. The defendant submitted the documents for *in camera* inspection on July 25, 2011.

## II.   DISCUSSION

### A.  Standard of Review

Congress enacted FOIA to promote transparency across the government. *See* 5 U.S.C. § 552; *Quick v. U.S. Dep't of Commerce, Nat'l Inst. of Standards & Tech.*, No. 09-02064, 2011 WL 1326928, at *3 (D.D.C. April 7, 2011) (citing *Stern v. FBI*, 737 F.2d 84, 88 (D.C. Cir. 1984). The Supreme Court has explained that FOIA is "a means for citizens to know 'what their Government is up to.' This phrase should not be dismissed as a convenient formalism. It defines a structural necessity in a real democracy." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171-172 (2004) (internal quotations and citations omitted). "The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). The strong interest in transparency must

be tempered, however, by the "legitimate governmental and private interests [that] could be harmed by release of certain types of information." *United Techs. Corp. v. U.S. Dep't of Defense*, 601 F.3d 557, 559 (D.C. Cir. 2010); *see also Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 872 (D.C. Cir. 1992). Accordingly, Congress included nine exemptions permitting agencies to withhold information from FOIA disclosure. 5 U.S.C. § 552(b). "These exemptions are explicitly made exclusive, and must be narrowly construed." *Milner v. Dep't of the Navy*, 131 S. Ct. 1259, 1262 (2011) (internal quotations and citations omitted) (citing *FBI v. Abramson*, 456 U.S. 615, 630 (1982)); *see also Pub. Citizen, Inc. v. Office of Management and Budget*, 598 F.3d 865, 869 (D.C. Cir. 2010).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact." Fed. R. Civ. P. 56. At the summary judgment stage, all justifiable inferences must be drawn in favor of the non-moving party to the extent supportable by the record. *Scott v. Harris*, 550 U.S. 372, 380 n.8 (2007); *see also United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam). In reviewing motions for summary judgment regarding FOIA exemptions, the district court must conduct a *de novo* review of the record. 5 U.S.C. § 552(a)(4)(B).

The government agency has the burden to demonstrate that the documents requested are exempt from disclosure. *See Assassination Archives & Research Ctr. v. CIA,* 334 F.3d 55, 57 (D.C. Cir. 2003); *Budik v. Dep't of Army*, 742 F. Supp. 2d 20, 29 (D.D.C. 2010). Because the agency is in the unique position of "[p]ossessing both the burden of proof and all the evidence," the agency must provide the Court and the challenging party "a measure of access without exposing the withheld information," which would "compromis[e] its original withholdings." *Judicial Watch, Inc. v. FDA*, 449 F.3d 141, 146 (D.C. Cir. 2006). Therefore, "[t]o enable the Court to determine whether documents properly were withheld, the agency must provide a

detailed description of the information withheld through the submission of a so-called 'Vaughn Index,' sufficiently detailed affidavits or declarations, or both." *Hussain v. U.S. Dep't of Homeland Sec.*, 674 F. Supp. 2d 260, 267 (D.D.C. 2009). The *Vaughn* Index:

> [F]orces the government to analyze carefully any material withheld, [ ] enables the trial court to fulfill its duty of ruling on the applicability of the exemption, and [ ] enables the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court.

*Judicial Watch, Inc. v. FDA*, 449 F.3d at 146.

A defendant is entitled to summary judgment in a FOIA case if it demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records, and each responsive record, which is located, was either produced to the plaintiff or is exempt from disclosure. *Weisberg v. U.S. Dep't of Justice*, 627 F.2d 365, 368 (D.C. Cir. 1980). To meet its burden, the defendant may rely on relatively detailed, non-conclusory declarations. *McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983). In the FOIA context, summary judgment is justified if the affidavits or other documents describe the documents and "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009) (citing *Miller v. Casey*, 730 F.2d 773, 776 (D.C. Cir. 1984). *See also Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *accord Campbell v. Dep't of Justice*, 164 F.3d 20, 30 (D.C. Cir. 1998). A court reviewing an agency's motion for summary judgment under FOIA is required to view the facts in the light most favorable to the FOIA requester. *See Burka v. U.S. Dep't of Health and Human Servs.*, 87 F.3d 508, 514 (D.C. Cir. 1996); *Chaplin v. Stewart*, No. 10-0518, 2011 WL 65742, at *3 (D.D.C. Jan. 10, 2011). An agency's declarations, however, are "accorded a presumption of good faith, which cannot be

rebutted by purely speculative claims about the existence and discoverabililty of other documents." *Negley v. FBI*, 169 Fed. App'x 591, 594 (D.C. Cir. 2006) (citing *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991)) (citation and internal quotation marks omitted); *Holt v. Dep't of Justice*, 734 F. Supp. 2d 28, 35-36 (D.D.C. 2010); *see Matter of Wade*, 969 F.2d 241, 246 (7th Cir. 1992) ("Without evidence of bad faith, the veracity of the government's submissions regarding reasons for withholding the documents should not be questioned.") (citation omitted).

### B. Analysis

The defendant has invoked Exemptions 4 and 5 to withhold certain disputed documents in their entirety and partially to redact others. *See generally Vaughn* Index. Based on a review of the parties' legal memoranda and the defendant's declarations and *in camera* submissions, the Court concludes that Treasury's withholdings and redactions are proper, except that the "Current Draft Talking Points" document contains some reasonably segregable material that should have been released.

#### 1. Analysis of Exemption 5 Claims

FOIA Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Exemption 5 provides the agency with the same privilege protections it would ordinarily have in civil discovery. If a document requested through FOIA "would be 'routinely' or 'normally' disclosed [in civil discovery] upon a showing of relevance," it must also be disclosed under FOIA; conversely, information that is normally protected in discovery is protected under Exemption 5. *Burka*, 87 F.3d at 516 (citing *FTC v. Grolier*, 462 U.S. 19, 26 (1983)). Put another way, Exemption 5 covers "those documents, and only those documents,

normally privileged in the civil discovery context." *Loving v. Dep't of Defense*, 550 F.3d 32, 37 (D.C. Cir. 2008) (citing *NLRB v. Sears, Roebuck & Co.,* 421 U.S. 132, 149 (1975)).  The two Exemption 5 privileges at issue in this case are the deliberative process privilege and the attorney-client privilege.

### a.  Deliberative Process Privilege Was Properly Asserted.

The common-law "privilege regarding the government's deliberative process" is one of the privileges incorporated into Exemption 5.  *Judicial Watch, Inc. v. Dep't of Energy*, 412 F.3d 125, 129 (D.C. Cir. 2005) (citing *Bureau of Nat'l Affairs v. Dep't of Justice*, 742 F.2d 1484, 1496 (D.C. Cir. 1984)).  The inclusion of the deliberative process privilege in the FOIA statute "reflect[s] the legislative judgment that the quality of administrative decision-making would be seriously undermined if agencies were forced to 'operate in a fishbowl' because the full and frank exchange of ideas on legal or policy matters would be impossible."  *Tax Analysts v. IRS*, 117 F.3d 607, 617 (D.C. Cir. 1997) (internal quotation omitted).  The deliberative process privilege is intended to protect "the decision making processes of government agencies." *Judicial Watch, Inc. v. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (citing *Sears,* 421 U.S. at 150).  The privilege's ultimate purpose is "to prevent injury to the quality of agency decisions."  *Id.*

To come within the privilege, therefore, a document must be both "pre-decisional" and "deliberative."  *See Judicial Watch, Inc. v. FDA*, 449 F.3d at 151.  A document is pre-decisional if it was generated before agency policy was adopted and deliberative if it "reflects the give and take of the consultative process."  *Id.*

The defendant asserts that all of the disputed documents except the "Current Draft Talking Points" were properly withheld or redacted pursuant to the deliberative process

privilege. The plaintiff does not dispute that the information is pre-decisional. The plaintiff, however, disputes that this privilege was properly applied and asserts that the defendant has "failed to satisfy its burden of proof to withhold information under the deliberative process privilege." Pl.'s Mem. at 14-15. Additionally, the plaintiff claims that the defendant has improperly withheld factual materials, which the plaintiff contends are not covered by the narrowly defined exception to the rule requiring disclosure of factual material.

### i. The defendant has satisfied its burden of proof to withhold information under the deliberative process privilege.

The plaintiff states that in order to succeed on a deliberative process privilege claim under Exemption 5, an agency must demonstrate that the withheld information "'would actually inhibit candor in the decision-making process if made available to the public.'" Pl.'s Mem. at 13 (quoting *Army Times Pub. Co. v. Dep't of the Air Force*, 998 F.2d 1067, 1072 (D.C. Cir. 1993)). According to the plaintiff, "an agency cannot meet its statutory burden of justification by conclusory allegations of possible harm," and that rather, "it must show by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA." *Id.* (quoting *Mead Data Central, Inc. v. U.S. Dep't of the Air Force*, 566 F.2d 242, 258 (D.C. Cir. 1977) (internal quotation omitted)). The plaintiff claims that the defendant merely offers "boilerplate conclusory language that mimics the language of the case law" and states that the defendant has failed to satisfy its burden. *Id.* at 14.

While it is true that affidavits parroting the case law are insufficient on their own, the defendant in this case provides more than affidavits merely parroting the case law standards. The plaintiff is correct that "[a]n agency cannot meet its statutory burden of justification by conclusory allegations of possible harm. It must show by specific and detailed proof that disclosure would defeat, rather than further, the purposes of the FOIA." *Mead Data*, 566 F.2d at

258. However, by identifying the role in the deliberative process played by each of the documents, the defendant has made the proper showing required in order to claim the deliberative process privilege. *See Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d 252, 259 (D.D.C. 2004) (requiring the agency to identify the role of a contested document in a specific deliberative process to prove that disclosure would defeat the purposes of FOIA).

The four e-mail strings among Treasury Staff and Treasury Legal concern Special Master Feinberg's anticipated meeting with AIG scheduled for November 3, 2009. *Vaughn* Index. The redacted portion of the email strings concern "proposed revisions to materials Treasury prepared in anticipation of Special Master Feinberg's meeting with AIG." *Id.*

The two "draft issues list" memoranda were attached to two of the e-mail strings and also relate to Special Master Feinberg's anticipated meeting with AIG scheduled for November 3, 2009. *Id.* These two pre-decisional memoranda were drafted by a Treasury attorney and include the proposed revisions referenced in the e-mail strings. *Id.*

The Samarias declaration states that these six documents include internal communications among Treasury personnel reflecting a host of pre-decisional matters, including: internal analyses of AIG's data submissions related to its executive structures; internal recommendations and proposals regarding possible approaches and actions to take with respect to outstanding policy matters related to the Special Master's ongoing review of AIG's compensation structures pursuant to the Interim Final Rule; candid internal discussions and legal analysis between Treasury staff and/or Treasury attorney Jackson regarding such on-going review; a "draft issue[s] list" memorandum prepared for the Special Master in anticipation of his November 3, 2009 meeting with AIG; and discussions among Treasury staff about how to best prepare the Special Master for that meeting. Samarias Decl. ¶¶ 43-44; *see also* Def.'s Mem. at

19-20.  The Samarias declaration also states that these "records reflect pre-decisional discussions between Treasury Officials, regarding (among other things) possible approaches to take with respect to outstanding policy matters at issue related to the Special Master's ongoing review of AIG's compensation structures pursuant to the Interim Final Rule, candid internal discussions and legal analysis between Treasury staff and/or a Treasury attorney regarding such on-going review, and recommendations for actions to policymakers from staff members and Treasury counsel." Samarias Decl. ¶ 44.

Such documents would reflect the give and take of the consultative process, and include recommendations or opinions on legal or policy matters. *See Vaughn v. Rosen*, 523 F.2d 1136, 1143-44 (D.C. Cir. 1975) (finding that a document is deliberative if it "makes recommendations or expresses opinions on legal or policy matters."); *see also Ctr. for Medicare Advocacy v. U.S. Dep't of Health & Human Servs.*, 577 F. Supp. 2d 221, 236 (D.D.C. 2008) (finding that documents containing "advice, recommendations, and suggestions" are "protected from disclosure under the FOIA's deliberative process exemption."); *Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Homeland Sec.*, 514 F. Supp. 2d 36, 46 (D.D.C. 2007) (protecting documents containing "solutions and approaches" pursuant to the deliberative process privilege); *Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 174 (D.D.C. 2004) (stating documents containing "talking points and recommendations on how to answer questions" were properly withheld under the deliberative process privilege).  Releasing an internal, pre-decisional analysis would defeat the purpose of the deliberative process privilege, which "rests on the obvious realization that officials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001).

The defendant properly identified the harm that would result from the release of information by noting that release would "have a chilling effect on open and frank discussions within the Treasury." *Vaughn* Index. The defendant further supports this claim through the declaration of Mr. Samarias, stating that "release of these records would discourage open and frank discussions among Treasury officials in the future, thereby threatening the confidence needed to ensure the candor of future Treasury deliberations." Samarias Decl. ¶ 47.

The defendant also properly identified the deliberative process that would be revealed if these documents were not withheld or redacted. The defendant states these documents regard "possible approaches to take with respect to outstanding policy matters at issue related to the Special Master's ongoing review of AIG's compensation structures pursuant to the Interim Final Rule." Samarias Decl. ¶ 44. As such, they fall within the protection of the deliberative process privilege. To the extent that the plaintiff argues an agency must prove that the withheld information "would *actually* inhibit candor," *see* Pl.'s Mem. at 13-14, the plaintiff overstates the defendant's required showing.[5] The defendant only needs to demonstrate that the information was pre-decisional and deliberative and that, therefore, the privilege is ultimately being invoked "to prevent injury to the quality of agency decisions by allowing government officials freedom to debate alternative approaches in private." *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997)

---

[5] The plaintiff's argument that the defendant must show that the withheld information "would actually inhibit candor" relies on a citation to *Army Times Pub. Co.* 998 F.2d at 1068-69. In that case, the FOIA defendant, the U.S. Air Force, withheld certain telephone poll results pursuant to deliberative process privilege while releasing other similar poll results to the public. 998 F.2d at 1068-69. The D.C. Circuit held that the poll results that had been released "contained purely factual information which could not threaten the Air Force's deliberative process in any way," and that "the affidavits submitted by the Air Force in support of its refusal to disclose [the other results] do not even hint that the poll results withheld are different from those released in any relevant respect." *Id.* at 1068. In that context, the D.C. Circuit instructed that, on remand, "the Air Force must demonstrate that, unlike the released poll results, the withheld poll results would actually inhibit candor in the decision-making process if made available to the public." *Id.* at 1072. Thus, the D.C. Circuit's comment referring to the defendant's requirement to show that the release of a document "would actually inhibit candor in the decision-making process" amounts to another way of saying that the defendant must show that the document is deliberative in nature. *See id.* at 1070 ("The propriety of the application of Exemption 5 [in *Army Times*] thus turns on whether the withheld documents were correctly characterized by the Air Force and the district court as deliberative.").

(referring to the "two requirements" of the deliberative process privilege).  The defendant has

demonstrated that the documents are both predecisional and deliberative.  Thus, the documents

have been properly withheld or redacted pursuant to deliberative process privilege.

### ii. Deliberative process privilege covers factual material presented in a form that would reveal agency deliberations.

The plaintiff states that these six documents contain factual material that is not exempt

pursuant to the deliberative process privilege.  Pl.'s Mem. at 14-15.  The plaintiff argues that the

agency has a duty to disclose any reasonably segregable, responsive factual information, and that

the agency has failed to demonstrate that disclosure of the factual information redacted or

withheld in the documents mentioned above would reveal any agency deliberations or bear on

the formulation or exercise of its judgment.  *See id.* at 15.

In withholding a responsive record under one of FOIA's enumerated exemptions, an

agency must nevertheless disclose any non-exempt information that is "reasonably segregable"

from the responsive record.  5 U.S.C. § 552(b).  An agency need not, for instance, "commit

significant time and resources to the separation of disjointed words, phrases, or even sentences

which taken separately or together have minimal or no information content."  *Schoenman v. FBI*,

No. 04-02202, 2011 U.S. Dist. LEXIS 12560, at *76 (D.D.C. Feb. 9, 2011) (citations omitted).

To discharge its burden before the district court, the agency "must provide a reasonably detailed

justification rather than conclusory statements to support its claim that the non-exempt material

in a document is not reasonably segregable." *Id.* (citations omitted).

Although purely factual information is generally not protected under the deliberative

process privilege, such information can be withheld when "the material is so inextricably

intertwined with the deliberative sections of documents that its disclosure would inevitably

reveal the government's deliberations."  *In re Sealed Case*, 121 F.3d at 737.  Such information is

protected in order to avoid allowing "the reader to probe too deeply into the thought processes of the drafters" and thus to avoid "a chilling effect on communication between agency employees regarding similar projects and the future." *Reliant Energy Power Generation, Inc. v. FERC*, 520 F. Supp. 2d 194, 204 (D.D.C. 2007). Thus, factual material is protected under the deliberative process privilege when disclosure would "expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Quarles v. Dep't of the Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) (citation omitted). Such material is protected because "Exemption 5 was intended to protect not simply deliberative material, but also the deliberative process of agencies." *Montrose Chemical Corp. of Ca. v. Train*, 491 F.2d 63, 71 (D.C. Cir. 1974).

"An agency may withhold a factual portion of a document if, in creating the document, the author undertook to separate significant facts from insignificant facts." *Reliant Energy Power Generation, Inc.*, 520 F. Supp. 2d at 203 (citing *Montrose Chem. Corp.*, 491 F.2d at 71). The rationale for this rule is that the act of selecting facts for inclusion in a document "constitutes an exercise of judgment by an agency." *Id.* (quoting *Montrose Chem. Corp.*, 491 F.2d at 71); *see also Mapother v. Dep't of Justice*, 3 F.3d 1533, 1539 (D.C. Cir. 1993) (finding factual information in a report protected when that "factual material was assembled through an exercise of judgment in extracting pertinent material from a vast number of documents for the benefit of an official called upon to take discretionary action."); *Judicial Watch, Inc. v. U.S. Postal Serv.*, 297 F. Supp. 2d at 262 (noting that documents could arrange facts in such a way that they reveal the policy judgments of the author and thus an agency's deliberative process).

In this case, the *Vaughn* Index indicates that all reasonably segregable portions of these documents have been released, while portions of these documents have been redacted pursuant to

the deliberative process privilege. *See Vaughn* Index. The Samarias declaration also indicates that the defendant performed a "document-by-document review" and that non-exempt information in the withheld or redacted materials "is so inextricably intertwined with the exempt information that any further separation of non-exempt information beyond the separation that Treasury has already done would produce only incomplete, fragmented, unintelligible sentences and phrases that are devoid of any meaning." Samarias Decl. ¶¶ 53-54; *see also Schoenman*, 2011 U.S. Dist. LEXIS 12560, at *76 (explaining that the question of segregability is context-specific and that an agency need not commit significant time and resources to the separation of disjointed words, phrases, or sentences that would provide minimal informational content). The defendant explained that it "redacted and withheld factual information regarding AIG's historical and proposed compensation payments and structures." Def.'s Mem. at 20-21. According to the defendant, these "facts were identified, extracted, and highlighted out of a larger group of potentially relevant facts" and the defendant suggests that, through this process, "agency employees were exercising their judgment as to what [factual information] would be important to the [Special Master] in making his decision . . . [and] were making an evaluation of the relative significance of facts." *Id.*; *see also* Def.'s Mem. in Opp'n to Pl.'s Cross Mot. for Summ. J. and Reply in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Reply") at 6 (quoting *Montrose Chem. Corp.*, 491 F.2d at 68) (internal quotations omitted) (alteration in original); Samarias Decl. ¶ 45.

The plaintiff objects to the defendant's contention that deliberative process privilege covers pre-decisional documents in which agency personnel have selected specific facts for inclusion and consideration in a summary or memorandum for use in the agency decision-making process. According to the plaintiff, "the case that appears to have given rise to [the] proposition that, in certain limited circumstances, summaries of factual materials may be subject

to" exemption under deliberative process privilege is the D.C. Circuit's 1974 ruling in *Montrose Chem. Corp.* Pl.'s Reply to Def.'s Opp'n to Pl.'s Cross Mot. for Summ. J. ("Pl.'s Reply") at 5. The plaintiff then attempts to distinguish *Montrose Chem. Corp.* from this case, relying heavily on dicta in *Montrose* in which the Court noted that "[w]here factual material is not already in the public domain, a different result might be reached." *Id.* at 6 (quoting *Montrose Chem. Corp.*, 491 F.2d at 71). Since the factual information at issue here includes confidential information about AIG's payment structure, rather than material "already in the public domain," the plaintiff contends that "this case thus presents precisely the type of situation in which disclosure . . . should result." *Id.* The problem with the plaintiff's argument, however, is that subsequent D.C. Circuit cases "make plain [that] the key to *Montrose Chemical* was not the relationship between the requested [factual] summaries and the public record, but that between the summaries and the decision announced by Agency." *Mapother*, 3 F.3d at 1539. The D.C. Circuit has reached that conclusion "notwithstanding [the *Montrose* court's] suggestion that 'a different result *might* be reached' in the case of information in the public domain." *Id.* Thus, where factual material was assembled into a summary or memorandum through an exercise of judgment in determining which facts to highlight "for the benefit of an official called upon to take discretionary action," deliberative process privilege may properly be asserted. *Id.* Therefore, the factual material in the disputed documents was properly redacted or withheld using the deliberative process exemption here.

Following *in camera* inspection, the Court is satisfied that the four e-mail strings and the "draft issues list" memoranda represent deliberative, pre-decisional communications regarding the Special Master's ongoing review of AIG's compensation structures pursuant to the Interim

Final Rule and are therefore properly withheld and redacted under the deliberative process privilege.

> ### b. Attorney-Client Privilege Covers Confidential Communications Between Agency Staff and the Agency Legal Department.

In addition to deliberative process privilege, Exemption 5 also incorporates the attorney-client privilege, which protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data*, 566 F.2d at 252. In the FOIA context, the agency is the "client" and the agency's lawyers are the "attorneys" for the purposes of attorney-client privilege. *See In re Lindsey*, 148 F.3d 1100, 1105 (D.C. Cir. 1998) (citing *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 863 (D.C. Cir. 1980)). To satisfy its burden, the defendant "must show that the withheld document (1) involves confidential communications between an attorney and his client and (2) relates to a legal matter for which the client has sought professional advice." *Wilderness Soc'y v. U.S. Dep't of the Interior*, 344 F. Supp. 2d 1, 16 (D.D.C. 2004) (internal quotations omitted).

The defendant contends that all of the disputed documents except the "Current Draft Talking Points" are properly withheld or redacted based on attorney-client privilege.[6] Def.'s Mem. at 15. The defendant states that the documents "contain privileged and confidential communication between Treasury staff and Robert Jackson, an attorney within Treasury's Office

---

[6] These are the same documents that the defendant asserts are exempted by deliberative process privilege, and, therefore, the defendant states "[w]ith respect to these documents, the Court need only find one exemption applicable to grant summary judgment to [the] [d]efendant." Def.'s Mem. at 14 n.4. The Court notes that there is a lack of precision regarding exactly which portions of these documents are withheld or redacted pursuant to attorney-client privilege. Initially, the defendant appeared to assert the two privileges coextensively, but, in its reply, the defendant appeared to clarify that it does not withhold certain factual material based on attorney-client privilege, but instead withholds this information solely under the deliberative process privilege and Exemption 4. *See* Def.'s Reply at 9. Since the Court has already determined that the deliberative process privilege shields all of the disputed information in these documents, the issue of the extent of the portions additionally protected by attorney-client privilege – and indeed the whole discussion of attorney-client privilege herein – is academic. Further, based on the Court's *in camera* review, it appears that the documents are substantially covered by attorney-client privilege. The Court notes, however, that to the extent the defendant was not claiming attorney-client privilege over the entirety of a communication, it should have indicated the specific portions it contends are covered by the privilege more precisely.

of the Assistant General Counsel who was assigned to provide counsel to the Office of the Special Master." *Id.* According to the Samarias declaration, the redacted portions of the four e-mail strings "reflect communication between [Office] staff [] and [attorney] Robert Jackson . . . in anticipation of the Special Master's upcoming meeting with AIG." Samarias Decl. ¶ 39. The two "draft issues list" memoranda were prepared by attorney Jackson and marked "Privileged and Confidential." *Id.* These drafts provide attorney Jackson's "legal analyses of AIG's proposed compensation structures and the requirements of the Interim Final Rule, in furtherance of the Special Master's ongoing analysis of AIG's compensation structures." *Id.* The defendant states that the legal advice provided in these documents was based upon facts provided confidentially by Treasury staff to its attorney and thus was properly withheld. *Id.* ¶ 40; Def.'s Mem. at 16.

The plaintiff disputes the application of attorney-client privilege because the withheld materials contain legal discussion concerning information provided to the Treasury by AIG or some other third party source and because the defendant has not demonstrated that the Treasury staff who purportedly provided information to attorney Jackson were authorized to "speak for" the defendant, which the plaintiff contends is a requirement for invoking attorney-client privilege.[7] *See* Pl.'s Mem. at 9-10.

_____

[7] The plaintiff also disputes the withholding of the two draft issues list memoranda because their titular description as "issues lists" does not seem compatible with the defendant's description of them as "Jackson's legal analyses of AIG's proposed compensation structures and the requirements of the Interim Final Rule." Pl.'s Mem. at 11. The defendant correctly responds, however, that it is the substance of the document that determines whether it is protected from disclosure under FOIA. Def.'s Reply at 8 (citing *F.B.I. v. Abramson*, 456 U.S. 615, 626 (1982)). The plaintiff also disputes the redaction in one of the e-mail strings (Bates number 39-40), as it appears to be a copy of another e-mail string (Bates number 35-36), with two extra sentences redacted. Pl.'s Mem. at 10. The defendant states that this inconsistency was inadvertent and has since corrected it by providing an updated production of the document to the plaintiff. Def.'s Reply at 11 n.3. The plaintiff contends that the inconsistencies in the redactions should undermine the defendant's claim of attorney-client privilege and that the defendant's claims of privilege be scrutinized carefully. Pl.'s Reply at 3-4. However, these mistakes do not imply bad faith nor do they rebut the presumption of good faith. *See Fischer v. U.S. DOJ*, 723 F. Supp. 2d 104, 108 (D.D.C. 2010).

### i. When seeking legal advice concerning the agency's own actions and legal interests, attorney-client privilege applies to communications containing third party facts.

According to the plaintiff, the facts provided to Treasury attorney Jackson come from "AIG or some other third party source" and therefore attorney-client privilege does not apply. *Id.* The fact that a request for legal advice concerned information originating with a third party does not necessarily defeat the claim of privilege, however. The four e-mail strings contain communication between Treasury Staff and its attorney, acting in his capacity as a legal advisor to the Treasury, and the two memoranda contain attorney Jackson's legal analyses of AIG's compensation structure and the requirements of the Interim Final Rule. *Vaughn* Index; Def.'s Mem. at 16. Such a request for legal advice concerns the agency's own actions and legal interests in connection with the Special Master's ongoing analysis of AIG's compensation structure, and "when the Government is dealing with its attorneys as would any private party seeking advice to protect personal interests, and needs the same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors, [Exemption 5] applies." *Cuban v. SEC*, 744 F. Supp. 2d 60, 78 (D.D.C. 2010) (quoting *Coastal States*, 617 F.2d at 863) (alteration in *Cuban*).

The documents here differ from the type of documents addressed in a line of cases in this Circuit that limit the applicability of attorney-client privilege for documents in which agency lawyers have provided legal advice about the application of regulations or statutes to the circumstances of third parties. *See, e.g.*, *Tax Analysts v. IRS*, 117 F.3d 607, 619 (D.C. Cir. 1997); *Schlefler v. United States*, 702 F.2d 233, 245 (D.C. Cir. 1983). In *Tax Analysts*, the D.C.

Circuit held that legal memoranda from the IRS Office of the Chief Counsel to field personnel advising the field officers of how to proceed on the situation of specific taxpayers were not protected from FOIA disclosure under attorney-client privilege. *Tax Analysts*, 117 F.3d at 609, 619. The Court held that because the advice responded to requests and information transmitted by taxpayers to the IRS regarding the taxpayers' situations – and concerned no new or confidential information regarding the agency – the advice was not protected under attorney-client privilege. *Id.* at 619. The Court's ruling hinged on the fact that the function of the IRS legal memoranda at issue was to "create a body of private law, applied routinely as the government's legal position in its dealings with taxpayers." *Id.*

Similarly, in *Schlefler*, the D.C. Circuit held that attorney-client privilege did not preclude disclosure of similar memoranda from the Chief Counsel of the Maritime Administration to Maritime Administration officials where the memoranda provided legal opinions on how to rule on requests from third parties for loans, subsidies, or other similar matters in accordance with relevant statutes, regulations, and agency policies. *Schlefler*, 702 F.2d at 236, 245.

In *Tax Analysts* and *Schlefler*, agency staff had requested legal advice regarding how to apply relevant law in decisions that would affect the third party who provided the agency with information or other similarly situated third parties. Although the legal advice does concern and affect AIG in this case, the situation here is different. Here, the legal advice sought did not concern how to apply a "body of agency law" in a manner analogous to *Tax Analysts* and *Schlefler*. Instead, the communication concerned the agency's own actions in its ongoing evaluation of AIG under the Interim Final Rule. As such, the agency here is "dealing with its attorneys as would any private party seeking advice to protect personal interests, and needs the

same assurance of confidentiality so it will not be deterred from full and frank communications with its counselors." *Cuban*, 744 F. Supp. 2d at 78. The agency staff sought legal advice "based upon facts provided confidentially by Treasury to its attorney" and the communication "has been held in confidence." Samarias Decl. ¶ 40. Thus, the assertion of attorney-client privilege was proper.

### ii. The defendant has shown that the Treasury Staff are protected under attorney-client privilege.

The plaintiff also claims that the defendant needs to demonstrate that the Treasury staff who provided information to attorney Jackson were authorized to "speak for" the defendant. Pl.'s Mem. at 10. According to the plaintiff, "when an organization is the client, only 'agents or employees of the organization who are authorized to act or speak for the organization in relation to the subject matter of the communication' are protected by [attorney-client] privilege." *Id.* (quoting *Hall v. CIA*, 668 F. Supp. 2d 172, 192 (D.D.C. 2009)). One of the correspondents in the e-mail strings is Camille Biros, who is not a regular Treasury employee, but rather a "special government employee," who is otherwise employed by a private entity. *Id.* at 10-11. Therefore, the plaintiff argues that any communications involving Ms. Biros and other special government employees like her are not protected under attorney-client privilege because these special government employees should be treated as third parties, absent some more detailed showing that these special employees are authorized to "speak for" the Treasury in relation to the subject matter of the privileged communication. *Id.* at 10-11.

The Court disagrees that all special government employees should be treated as third parties that break the agency's claim of privilege. The plaintiff's understanding of attorney-client privilege is overly narrow. The defendant points out that the plaintiff's privilege argument relies on *Hall v. CIA*, a district court case which in turn relies on *Mead Data*, a 1977 case in

24

which the defendant contends the "D.C. Circuit adopted the so-called 'control group test' for determining the scope of the attorney-client privilege when the client is an organization or government agency." Def.'s Reply at 10 (citing *Mead Data*, 566 F.2d at 253 n.24). The defendant further argues that after *Mead Data* was decided, the Supreme Court rejected the "control group test" for organizational privilege in *Upjohn Co. v. United States*. *Id.* (citing *Upjohn Co. v. United States*, 449 U.S. 383, 390 (1981)).

Under the "control group test," attorney-client privilege only protects communications involving an organization's senior management or "control group." In *Upjohn*, the Supreme Court rejected that test as overly narrow. The Supreme Court held that "it will frequently be employees beyond the [organization's] control group . . . [who will be] responsible for directing [the company's] actions in response to legal advice – who will possess the information needed by the corporation's lawyers. Middle-level – and indeed lower-level – employees can, by actions within the scope of their employment, embroil the corporation in serious legal difficulties, and it is only natural that these employees would have the relevant information needed by corporate counsel if he is adequately to advise the client with respect to such actual or potential difficulties." 449 U.S. at 391 (internal quotation marks omitted). Accordingly, following *Upjohn*, the defendant claims that it only needs to prove that the communication "concern[s] matters within the scope of the employee's [] duties." Def.'s Reply at 10 (quoting *Upjohn*, 449 U.S. at 391, 394).

The Court finds that *Mead Data*, whose language is ultimately relied upon by the plaintiff, never expressly endorsed the "control group" test. The D.C. Circuit in *Mead Data* stated that "[w]here the client is an organization, the privilege extends to those communications between attorneys and all agents or employees of the organization who are authorized to act or

speak for the organization in relation to the subject matter of the communication." *Mead Data* 566 F.2d at 253 n.24. This statement may be viewed as consistent with *Upjohn*'s holding that an employee's communications with attorneys can be covered by privilege where the communication "concern[s] matters within the scope of the employee's [] duties." Thus, to the extent the plaintiff is attempting to invoke a different test, the plaintiff's attempt is misguided.

Courts in this Circuit have routinely held that attorney-client privilege applies to employees at varying levels of seniority in an agency or corporation. *See Judicial Watch v. Dep't of the Army*, 466 F. Supp. 2d 112, 121 (D.D.C. 2006) (stating attorney-client privilege "applies to confidential communications made to an attorney by both high-level agency personnel and lower-echelon employees"); *Hornbeck Offshore Transp., LLC v. U.S. Coast Guard*, No. 04-1724, 2006 WL 696053, at *14 (D.D.C. Mar. 20, 2006) (explaining that because "agency employees who do not have the ultimate authority to determine policy still might possess information that is useful to the agency's attorney, the Supreme Court has extended FOIA protection to their communications with agency lawyers.") (citing *Upjohn*, 449 U.S. 392-97); *Alexander v. FBI*, 198 F.R.D. 306, 314 (D.D.C. 2000) ("[C]ommunications with counsel by corporate employees are privileged, so long as the communications concerned matters within the scope of the employees' corporate duties, and the employees themselves were sufficiently aware that they were being questioned in order that the corporation could obtain legal advice.") (internal quotations and citations omitted); *Nakajima v. Gen. Motors Corp.*, 857 F. Supp. 100, 104 (D.D.C. 1995) ("[A] corporation's attorneys' conversations with corporate employees are privileged if [] [t]he communications concern[] matters within the scope of the employees' corporate duties . . . .") (internal quotations and citations omitted).

The defendant states that the disputed documents contain communications between attorney Jackson and Camille Biros, Mary Pat Fox, and Katherine Mueller and concern matters within the scope of these employees' duties. Def.'s Reply at 10-11. According to the defendant's declarations, Ms. Biros was "retained by Treasury as [a] 'special government employee[]' to assist the Office of the Special Master" and she and Ms. Fox were "principally involved in Treasury's review of AIG's compensation structures during the time frame at issue" in this case. Samarias Decl. ¶ 34 & n.3. Ms. Mueller was employed as a Treasury "Executive Compensation Specialist," who was assigned to work with the Special Master during the relevant time frame. Suppl. Samarias Decl. ¶ 3. In addition, one of the disputed documents was forwarded to William Mulvey, who at the time, served as "Attorney Advisor in the Office of Financial Stability at Treasury and was assigned to work with the Special Master." *Id*. ¶ 4. The defendant states that assisting with the review of AIG's compensation structures was "clearly within the scope of each of these employees' duties and thus their communication with attorney Jackson regarding this matter are exempt." Def.'s Reply at 11. The Court agrees and, following *in camera* review, finds the defendant's assertion of attorney-client privilege to be proper.

### 2. Analysis of Exemption 4 claims

Exemption 4 exempts from agency disclosure "commercial or financial information [that is] obtained from a person and [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). In this Circuit, the terms "commercial" and "financial" are given their ordinary meanings. *See Nat'l Ass'n of Homebuilders v. Norton*, 309 F.3d 26, 38 (D.C. Cir. 2002); *Pub. Citizen Health Research Group v. FDA*, 704 F.2d 1280, 1290 (D.C. Cir. 1983). "Commercial" is defined broadly to include "records that reveal basic commercial operations or relate to income-producing aspects of a business" as well as situations where the "provider of the information has

27

a commercial interest in the information submitted to the agency." *Baker & Hostetler, LLP v. U.S. Dep't of Commerce*, 473 F.3d 312, 319 (D.C. Cir. 2006) (internal quotation omitted). Banks and other financial institutions are considered "persons" for the purposes of the exemption. *See* 5 U.S.C. § 551(2) ("'person' includes an individual, partnership, corporation, association, or public or private organization."). Under *National Parks and Conservation Ass'n v. Morton*, 498 F.2d 765 (D.C. Cir. 1974), commercial or financial information that is required to be provided to the government is "confidential" if disclosure is likely either "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* at 770 (footnote omitted). On the other hand, information that is provided voluntarily is confidential "if it is of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass Energy Project v. Nuclear Regulatory Comm'n*, 975 F.2d 871, 879 (D.C. Cir. 1992). Some of the disputed documents were provided voluntarily and some were required by the agency.[8] The defendant contends that certain information in all of the disputed documents was redacted or withheld pursuant to Exemption 4.

### a. The Information Voluntarily Submitted by AIG to the Treasury was Properly Withheld.

The defendant claims that the entire document entitled "Current Draft Talking Points" was provided voluntarily and withheld in full pursuant to Exemption 4. Def.'s Mem. at 23. For a voluntary submission, the information is considered confidential if it is "of a kind that would customarily not be released to the public by the person from whom it was obtained." *Critical Mass,* 975 F.2d at 879. The defendant may meet this burden "by supplying declarations as to customary treatment." *Judicial Watch v. Dep't of the Army*, 466 F. Supp. 2d at 126. "Limited

---

[8] The parties do not dispute which information was provided voluntarily and which information was required to be submitted. *See* Def.'s Mem. at 23-24*; see* Pl.'s Mem. at 16-20.

disclosures, such as to suppliers or employees, do not preclude protection under Exemption 4, as long as those disclosures are not made to the general public." *Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 93 F. Supp. 2d 1, 17-18 (D.D.C. 2000) (citing *Critical Mass*, 975 F.2d at 880).

The defendant states that the "Current Draft Talking Points" document contains confidential commercial or financial information obtained from AIG related to compensation and retention matters. *Vaughn* Index. In support of its contention, the defendant also provides a declaration from Eric Litzky, Vice President-Corporate Governance and Special Counsel and Secretary to the board of Directors of AIG. Mr. Litzky explains that the "Current Draft Talking Points" are "private, confidential materials related to corporate strategy and are not the type that AIG would customarily disclose to the public." Litzky Decl. ¶ 4. The defendant also claims that the cover email indicates that the document "contained confidential information and was not to be disseminated, distributed, or copied." [9] Def.'s Reply at 14.

The plaintiff argues that the defendant failed to meet its burden because the document's cover email indicated that it was sent to a "great many individuals," including persons at the Federal Reserve Bank of New York and that, therefore, the information was not confidential. Pl.'s Mem. at 17. The plaintiff contends that confidentiality is broken if a document is shared with third parties, unless the defendant can "demonstrate that [such] dissemination was 'necessary' or that steps were taken to ensure that other recipients treated the draft talking points as confidential." Pl.'s Reply at 7-8 (citing *Ctr. for Auto Safety*, 93 F. Supp. 2d at 17-18). The plaintiff also contends that the confidentiality legend in the cover e-mail is "boilerplate" and insufficient. *Id.*

---

[9] The parties do not dispute the redactions in the cover e-mail (Bates number 18) to "Current Draft Talking Points." *See* Pl.'s Mem. at 3; Def.'s Mem. at 9.

Since "[l]imited disclosures . . . do not preclude protection under Exemption 4, as long as those disclosures are not made to the general public," a threshold question for the Court is whether the disclosure of the information in the "Current Draft Talking Points" document was widespread enough to defeat the exemption. *Ctr. for Auto Safety*, 93 F. Supp. 2d at 17-18; *see also Parker v. Bureau of Land Management*, 141 F. Supp. 2d 71, 79 (D.D.C. 2001) (stating "limited disclosures, not made to the general public, do not preclude Exemption 4 protection."). The Court finds that the limited disclosures reflected in the cover email do not suggest that it was publicly distributed. Rather, the cover email is addressed to the AIG Board of Directors and the email headers indicate distribution to what appear to be several internal AIG email recipients as well as two outside addresses at the Federal Reserve Bank of New York ("FRBNY"). *See* ECF No. 15, Ex. 1, at 19; *see also* Def.'s Reply at 14 (indicating the email was sent mainly to AIG board members and staff). The FRBNY is a Congressionally-chartered banking institution that is part of the Federal Reserve System, the central bank of the United States. *Bloomberg L.P. v. Bd. of Governors of Fed. Reserve Sys.*, 649 F. Supp. 2d 262, 265-66 (S.D.N.Y. 2009). As such, it combines aspects of a private entity with aspects of a government agency. *See id.* For example, the FRBNY can enter into its own contracts, but it also has a regulatory role in the banking industry and provides all revenue in excess of expenses to the Treasury. *Id.* Given the FRBNY's role, the Court finds that the limited disclosures of information to the FRBNY are akin to the type of limited disclosures, such as to suppliers or employees, that do not preclude protection under Exemption 4. Here, the Litzky declaration explains that the information at issue is not a type AIG customarily discloses to the public, and the cover email contained a confidentiality legend, which warned the recipients of the e-mail that the information, including the attachment, inside may be confidential and should not be disseminated, distributed, or

copied.  Litzky Decl. ¶ 4; ECF No. 15, Ex. 1, at 19 (Cover Email).  Therefore, the confidentiality of this information is not waived due to public disclosure.

Following *in camera* review, however, the Court finds that the "Current Draft Talking Points" documents contains information that is both reasonably segregable and not confidential in nature—namely: the entirety of the first page through the top bullet point on page two; the third page from the line "Here are some of the things we would like from you . . ." to the end of the page; and the fourth page from the line "Summary of Retention Programs" to the end of the page.  Even when an agency establishes that it has properly withheld a document under a FOIA exemption, "it must nonetheless disclose all reasonably segregable, nonexempt portions of the requested record(s)." *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1167 (D.C. Cir. 2011) (internal citations omitted); *see also Mead Data*, 566 F.2d at 260 (stating that "[t]he focus of the FOIA is information, not documents, and an agency cannot justify withholding an entire document simply by showing that it contains some exempt material.").  "The 'segregability' requirement applies to all documents and all exemptions in the FOIA."  *Ctr. for Auto Safety v. EPA*, 731 F.2d 16, 21 (D.C. Cir. 1984).

The Samarias declaration indicates that the non-exempt information in the documents is so "inextricably intertwined with the exempt information that any further separation of non-exempt information beyond the separation that the Treasury has already done would produce only incomplete, fragmented, unintelligible sentences and phrases that are devoid of any meaning."  The apparently non-exempt information in the "Current Draft Talking Points" document that the Court has identified above, however, is easily separable from the exempt portions and would not produce incomplete sentences devoid of any meaning.  Accordingly, the defendant must release the portions of the "Current Draft Talking Points" indicated above.

### b. The Required Information Obtained from AIG was Properly Withheld.

Commercial or financial information that is required to be provided to the government is "confidential" if disclosure is likely either "(1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the person from whom the information was obtained." *National Parks*, 498 F.2d at 770. If either one of these two prongs of the *National Parks* standard is satisfied, the information is deemed confidential and may be properly withheld under Exemption 4.

The defendant states that the two "draft issues list" memoranda and the four e-mail strings were required submissions because the documents were provided by AIG to Treasury pursuant to AIG's data submission obligations under the Interim Final Rule. Def.'s Mem. at 23. According to the defendant, the two "draft issues list" memoranda contain "confidential business information received from AIG" and that the four e-mail strings "reference or cite confidential business information received from AIG regarding AIG's compensation structures and retention programs. *Id.* at 23-24. The defendant does not claim that the information in the disputed documents is likely to "impair the Government's ability to obtain necessary information in the future." Instead, the defendant states that these six documents are exempt because they would "cause substantial harm to the competitive position of the person from whom the information was obtained." *Id.* at 25-26.

To support this claim, the defendant provides an affidavit from Jeffrey Hurd, Senior Vice President of Human Resources and Communications for AIG. Mr. Hurd states that there is "a very real risk that competitors will use the apparently detailed and specific figures and structural

descriptions in [the disputed documents] to poach valuable AIG employees." Hurd Decl. ¶ 5. Mr. Hurd further states that the "loss of employees is particularly damaging in the insurance and financial services business, in which relationships and contacts are particularly important. The loss of a key employee often means the loss of key customers, to the clear competitive disadvantage of AIG." *Id.* ¶ 7. Additionally, Mr. Hurd contends that the "disclosure of [this information] could decrease morale . . . because employees are not typically informed about how their colleagues are compensated." *Id.* ¶ 6.

The plaintiff argues that the defendant has failed to meet its burden because "Mr. Hurd provides no evidence that employee desertions will cause AIG to suffer 'substantial' competitive harm much less that such harm is 'imminent.'" Pl.'s Mem. at 20. The plaintiff also points out that "Mr. Hurd has not <u>even seen</u> the withheld documents at issue." *Id*. (emphasis in original). The plaintiff also states that competitive harm should "be limited to harm flowing from the affirmative use of proprietary information and 'should not be taken to mean' harms such as 'employee disgruntlement.'" *Id.* at 19 (quoting *Public Citizen*, 704 F.2d at 1291 n.30).

The defendant, however, is not required to prove "imminent" harm. The agency must only show that release of the withheld documents "is *likely* to… cause substantial harm to the competitive position of the person from whom the information was obtained." *Nat'l Parks*, 498 F.2d at 770 (emphasis added). Nor is the fact that Mr. Hurd has not "even seen" the withheld documents dispositive. The defendant claims that Mr. Hurd has not seen the disputed documents because they are protected under the deliberative process and attorney-client privileges. Def.'s Reply at 14. The defendant, however, states that Mr. Hurd was "aware of the nature of the information withheld" and that it was "AIG that provided the information at issue to Treasury" in

the first place.  *Id.* at 15.  Therefore, the key issue is whether this information, if released, would cause substantial harm to the competitive position of AIG.

The plaintiff is correct in stating that "competitive harm does have to be a result of the affirmative use of proprietary information."  Therefore, Mr. Hurd's statement that releasing the information could cause decreased morale is irrelevant.  *See Public Citizen*, 704 F.2d at 1291 n.30 ("[T]he important point for competitive harm in the FOIA context . . . is that it be limited to harm flowing from the affirmative use of proprietary information by competitors.  Competitive harm should not be taken to mean simply any injury to competitive position, as might flow from customer or employee disgruntlement.").

Mr. Hurd's assertion that competitors can use the information affirmatively to "poach valuable AIG employees" is more relevant to the court's inquiry, however.  The defendant argues that release of this information could harm the competitive position of AIG because it would allow competitors to more accurately poach employees.  While the defendant does not point to any cases that directly address this form of alleged competitive injury, revealing AIG's compensation structures may cause harm by revealing AIG's business strategy and cost structure.  On the other hand, the release of compensation structures would likely result in less substantial and directly competitive harm than, say, revealing unit pricing in a contract.  *Cf. Essex Electro Eng'rs, Inc. v. U.S. Sec'y of the Army*, 686 F. Supp. 2d 91, 94 (D.D.C. 2010) (finding that revealing unit prices in a contract would cause substantial competitive harm because they would reveal business strategy and cost structure).  Compensation is only one of many factors that would persuade someone to leave for another company, and competitors could already poach AIG's employees by making them favorable salary offers without knowing their current compensation information – although a detailed picture of AIG's compensation structure

would certainly making poaching easier. *Cf. McDonnell Douglas Corp. v. U.S. Dep't of the Air Force*, 375 F.3d 1182, 1189 (D.C. Cir. 2004) (withholding contract information under Exemption 4 because it would "significantly increase the probability [that] competitors would underbid [] in the event the Air Force rebids the contract.").

In any event, this Court does not need to decide whether the defendant has proved that the release of information would cause substantial harm to AIG because the same information is exempt under Exemption 5, as discussed *supra*.

### 3. Segregability

As discussed above, if a record contains both exempt and non-exempt material, all non-exempt material that is reasonably segregable must be released. *See Roth*, 642 F.3d at 1167. Based on the Court's *in camera* review of the disputed documents, the Court concludes that the agency has produced all reasonably segregable responsive portions of all documents at issue, except for the "Current Draft Talking Points" document identified above.

## III. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is granted except as to the "Current Draft Talking Points" document. On or before August 26, 2011, the defendant shall produce to the plaintiff copies of the "Current Draft Talking Points" document that do not redact the non-exempt and reasonably segregable information discussed above or, alternatively, the defendant shall file a renewed motion demonstrating why this information is exempt or not reasonably segregable. In all other respects, the defendant's motion is granted and the plaintiff's motion is denied.


DATED: August 16, 2011                    /s/ *Beryl A. Howell*
                                          BERYL A. HOWELL
                                          United States District Judge